IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHRIS SAMUELS, et al., | ) |
| Plaintiffs, | ) |
| v. | ) CIVIL ACTION 06-0564-WS-M |
| ARMSTEAD W. JOYNER, et al., | ) |
| Defendants. | ) |

**ORDER**

This matter is before the Court on the motion of defendants Armstead W. Joyner and Armstead Joyner & Associates ("Associates") (collectively, "the Joyner defendants") to compel arbitration and stay these proceedings or, in the alternative, to transfer. (Doc. 11). The plaintiffs have filed a response and the Joyner defendants a reply, (Docs. 19, 23), and the motion is ripe for resolution. After carefully considering the foregoing and other relevant materials in the file, the Court concludes that the motion to compel arbitration and stay proceedings is due to be granted in part and denied in part. The Court also concludes that a ruling on the motion to transfer should be deferred pending briefing on the propriety of continued federal proceedings.

**BACKGROUND**

Plaintiff Chris Samuels decided to invest in real estate and construction. He turned to Joyner for assistance. In September 2002, Samuels and the Joyner defendants executed a contract ("the Agreement"). (Doc. 11, Exhibit A). The project covered by the Agreement was stated as follows:

> FORM A LIMITED LIABILITY CORPORATION, PROGRAMMING, AFFORABLE [sic] HOUSING PROJECT IN SELMA, AL _ LAND ACQUISITION _ CONSTRUCTION AND PERMANENT FINANCING _ CONSTRUCTION MANAGEMENT _ FEASIBILITY AND MARKETING

STUDIES _ LEGAL AND ACCOUNTING
(*Id.* at 1-1).  Plaintiff CRS-Development, LLC ("CRS") was the entity formed to implement the Project.  The "affor[d]able housing project in Selma" was known as the "Selma Gardens Project."

Once CRS was formed (with Samuels as the sole member), Samuels appointed Joyner as executive vice-president, in which capacity Joyner had the day-to-day responsibility of running CRS and its projects, including the Selma Gardens Project. (Doc. 1, ¶¶ 12-14).

In 2004, Samuels, Joyner and others purchased Quality Housing Corporation (a North Carolina manufacturer of energy-efficient housing panels) and executed a Shareholders Agreement.  (Doc. 1, ¶¶ 21-22).

The complaint identifies the following wrongful conduct by Joyner and/or Associates:

> 1.  Before and after entering the Agreement, Joyner represented that he had extensive knowledge and expertise in the areas of real estate and construction (Doc. 1, ¶¶ 12-15, 18, 20);
>
> 2.  Before entering the Agreement, Joyner misrepresented how he would be compensated with respect to the Selma Gardens Project (*id.*, ¶¶ 19-20);
>
> 3.  In July 2006, after Samuels paid off a large Quality Housing loan, Joyner refused to reimburse Samuels in accordance with the Shareholders Agreement (*id.*, ¶¶ 23-26);
>
> 4.  In June 2005, Joyner, on behalf of CRS but without authority to do so, entered a contract with defendant Major Sanders, an architect, for work on the Selma Gardens Project (*id.*, ¶ 27);
>
> 5.  Before and after entering the Shareholders Agreement, Joyner misrepresented that others besides Samuels would provide collateral and personal guaranties of a line of credit for Quality Housing (*id.*, ¶¶ 32-38, 44-45);

6. Joyner misrepresented that key man life insurance would be obtained on two principals in Quality Housing and suppressed the failure to obtain such insurance (*id*., ¶¶ 32, 39-45);

7. In April 2006, Joyner misrepresented that the Quality Housing loan was in default and that Samuels' collateral would be pursued if he did not provide another $200,000 (*id*., ¶¶ 48-51);

8. In collusion with Joyner, Sanders suppressed financial information concerning Quality Housing (*id*., ¶ 52-55);

9. Joyner provided a bad faith estimate of his costs for the Selma Gardens Project (*id*., ¶ 56);

10. Joyner misrepresented that the homes designed for the Selma Gardens Project would be in the average range for homes in the Selma (*id*., ¶¶ 57-58);

11. Joyner designed and approved an assisted living facility with 118 beds despite a feasibility study showing a need for only 40 beds (*id*., ¶ 59);

12. Before Joyner was hired, he presented a falsely low estimate of the cost per house of structural panels (*id*., ¶ 61);

13. Joyner later inflated the cost of panels provided by Quality Housing and falsely misrepresented that an accountant had collaborated in figuring the cost (*id*., ¶¶ 62-64);

14. Joyner forged Samuels' signature on a CRS check to an organization of which Joyner was president (*id*., ¶ 66);

15. Joyner received CRS checks totaling over $18,000, which he recorded in the register as $200 (*id*., ¶¶ 67-69); and

16. Joyner destroyed CRS records and software on CRS computers (*id*., ¶¶ 74-76).

The complaint asserts the following causes of action against Joyner based on the conduct described above:

- Breach of fiduciary duty (Count Three);

- Fraudulent misrepresentation (Count Four);
- Fraudulent suppression (Count Five);
- Conspiracy to defraud (Count Six);
- Aiding and abetting (Count Seven);
- Money paid by mistake or fraud (Count Eight);
- Unjust enrichment (Count Nine);
- Breach of contract (the Shareholders Agreement) (Count Ten);
- Computer Fraud and Abuse Act (¶¶ 74-76); and
- Spoliation (¶¶ 74-76).

(Doc. 1 at 18-19, 21-28).[1] Counts Four through Nine are asserted against Associates as well, based on the same conduct. (*Id*. at 22-27).

The Agreement provides that "[a]ny claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration." (Doc. 11, Exhibit A at 1-7, ¶ 1.3.5.1). The Joyner defendants argue that all claims against them "aris[e] out of or [are] related to" the Agreement and so must be referred to arbitration.

## DISCUSSION

"In the absence of an agreement to arbitrate, a court cannot compel the parties to settle their dispute in an arbitral forum." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). Thus, in ruling on a motion to compel arbitration, "[t]he first step is to determine whether the parties agreed to arbitrate the dispute." *Id*. The second step is to consider "whether legal constraints external to the parties' agreement foreclosed arbitration." *Id*. at 1200 (internal quotes omitted).

Turning to the first step, whether the parties agreed to arbitrate a particular dispute

---

[1] Although the federal claim and related spoliation claim are not set forth in counts styled as such, both sides recognize that these claims are asserted. (Doc. 1 at 3, ¶ 9; Doc. 11 at 6; Doc. 19 at 7; Doc. 23 at 8).

"is a matter of contract interpretation." *Telecom Italia, S.P.A. v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001). Once the meaning of the term "arising out of or related to" is determined, the Court must apply it to each of the claims the plaintiffs bring. Thanks to a "liberal federal policy favoring arbitration agreements," *Klay*, 389 F.3d at 1200 (internal quotes omitted), "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 n.1 (11th Cir. 2004) (internal quotes omitted).

The parties do not question the evident proposition that any claim "arising under" the Agreement necessarily is "related to" the Agreement. Because the latter language cuts the broader swath, the Court focuses on its scope.

The Joyner defendants propose that the Court construe the key phrase as supporting arbitration: (1) "where there is a significant relationship between the asserted claims and the contract containing the arbitration clause"; (2) where the claim "is either directly or indirectly related to the subject matter of the contract"; or (3) where "the dispute occurs as a fairly direct result of the performance of the contractual duties." (Doc. 23 at 2 (internal quotes omitted)). With no alternative suggested by the plaintiffs,[2] the Court accepts this proposal. The Court's task becomes the application of these definitions to the claims asserted.

The duties assigned the Joyner defendants by the Agreement included land acquisition, construction financing, permanent financing, construction management, feasibility studies, marketing studies, and legal/accounting matters, all with respect to the Selma Gardens Project. Any claims challenging the Joyner defendant's performance of these duties arise under and relate to the Agreement and are subject to arbitration. Moreover, any claims that the Joyner defendants secured the Agreement wrongfully also must be raised in arbitration. *E.g., Jenkins v. First American Cash Advance, LLC*, 400

---

[2]The plaintiffs' only proffer is the functional equivalent of the Joyner defendants' third formulation, expressed as a negative. (Doc. 19 at 2).

F.3d 868, 876-77 (11th Cir. 2005) (claims of fraudulent inducement of the contract, as opposed to fraudulent inducement of the arbitration clause, must be resolved by the arbitrator). The conduct described above in paragraphs 1-2 and 9-13 is captured by this rule, and claims raising this conduct must be resolved by arbitration.

The plaintiffs protest that the conduct described in certain of these paragraphs occurred after Joyner had been made vice-president of CRS. (Doc. 19 at 6-7). While Joyner's duties as an officer overlapped those previously imposed by the Agreement, the Agreement was not superseded by Joyner's assumption of office, and disputes that arise under or relate to the Agreement do so regardless of whether they may also arise under or relate to his official duties.

The Joyner defendants argue that disputes concerning Quality Housing are related to the Agreement because Quality Housing furnished structural panels for the Selma Gardens Project, and obtaining structural panels fell within their construction management duties under the Agreement. (Doc. 23 at 6, 8). The conduct alleged in paragraph 13 above does relate to the furnishing of panels and, as already noted, is captured by the arbitration clause. The conduct alleged in paragraphs 5-8, however, reflects the Joyner defendants' efforts to persuade the plaintiffs to acquire and retain Quality Housing as an investment, and nothing in the Agreement tasked the Joyner defendants with pursuing additional investment vehicles. That the Agreement may have placed them in a position to advise the plaintiffs on additional investments does not satisfy the definitions of "related to" that the Joyner defendants champion. For like reasons, the conduct alleged in paragraph 3 is not related to the Agreement.

The conduct alleged in paragraph 4 is subject to arbitration because the Agreement assigned the Joyner defendants with architectural responsibilities on the Selma Gardens Project. Indeed, the Agreement itself identifies Sanders as a consultant retained by the Joyner defendants at their expense. (Doc. 11, Exhibit A at 1-3, ¶ 1.1.3.5).

The conduct alleged in paragraphs 14 and 15 concerns checks on CRS's account

received by Joyner and his association. Because the complaint does not allege that the checks were created independently of the Agreement, and because the Agreement clearly entitled Joyner to some measure of compensation while there is no allegation that his status as an officer of CRS did so, it appears likely that the checks represent compensation or reimbursement (whether or not earned or agreed) under the Agreement. To the extent that doubt remains, it must be resolved in favor of arbitration.

The conduct alleged in paragraph 16 includes the destruction of "all of the electronic corporate records for the company." (Doc. 1, ¶ 74). The Court can only conclude from this sweeping allegation that at least some of the destroyed records concerned the Selma Gardens Project and Joyner's duties with respect thereto, such that this allegation is related to the Agreement. To the extent there is doubt, the Court is required to resolve that doubt in favor of arbitration.

As noted, the second step in ruling on a motion to compel arbitration is to consider "whether legal constraints external to the parties' agreement foreclosed arbitration." *Klay*, 389 F.3d at 1200. The sole legal constraint identified by the plaintiffs is that the Joyner defendants are estopped to demand arbitration. (Doc. 19 at 4-5). The plaintiffs rely for this argument on a letter from Joyner's counsel in an arbitration already under way relating to Joyner's demand for compensation under the Agreement. The portion of the redacted letter presented to the Court addresses only the Quality Housing issues that the Court has already ruled are not subject to arbitration. (*Id*., Exhibit 4).[3]

To summarize, the plaintiffs' claim for breach of the Shareholders Agreement (Count Ten) is not subject to arbitration; the plaintiffs' claims for spoliation and violation of the Computer Fraud and Abuse Act (¶¶ 74-76) are subject to arbitration; and the plaintiffs' remaining claims (Counts Three - Nine) are subject to arbitration to the extent

---

[3]Because the Court need not and does not rely on the letter to conclude that the Quality Housing issues are not subject to arbitration, the Joyner defendants' motion to strike the exhibit, (Doc. 22), is **denied as moot**.

based on the conduct identified in paragraphs 1-2, 4 and 9-16 and not subject to arbitration to the extent based on the conduct identified in paragraphs 3 and 5-8.

This lawsuit involves five defendants,[4] twelve causes of action, and 19 pages of factual allegations.  The lawsuit was properly filed in federal court only because a single cause of action, brought against a single defendant based on half a page of allegations, asserted a federal cause of action.  That claim is now being ordered to arbitration, and the only remaining action this Court could take with respect to it is to entertain a challenge to the arbitral decision.

The Joyner defendants invite the Court to transfer the non-arbitrable portions of this action to the Eastern District of Virginia, but a more immediate question is whether those portions should remain in federal court at all.  The Court will neither assess the parties' positions on the motion to transfer nor trouble a sister court before that preliminary issue is resolved.

## CONCLUSION

For the reasons set forth above, the Joyner defendants' motion to compel arbitration and stay proceedings is **granted** with respect to the plaintiffs' claims for spoliation and violation of the Computer Fraud and Abuse Act and **granted** with respect to the plaintiffs' claims against the Joyner defendants under Counts Three through Nine, to the extent those claims are based on the conduct identified in paragraphs 1-2, 4 and 9-16 of this order.  To that extent, this action is **stayed** pending resolution of the arbitration proceedings.  In all other respects, the motion to compel arbitration and stay proceedings is **denied**.

The plaintiffs are **ordered** to file and serve, on or before **January 30, 2007**, a brief

---

[4]The complaint purports to name fictitious defendants.  Fictitious party practice is not recognized in federal court.  *See, e.g., New v. Sports & Recreation, Inc.,* 114 F.3d 1092, 1094, 1097 (11th Cir. 1997) (trial court did not err in striking fictitious parties); *Weeks v. Benton*, 649 F. Supp. 1297, 1298 (S.D. Ala. 1986); Fed. R. Civ. 10(a).

setting forth, and supporting with authority and cogent argument, their position as to whether this action should remain in federal court. The defendants are **ordered** to file and serve, on or before **February 6, 2007**, a similarly supported brief setting forth their position on this issue. The parties' briefs shall address, without limitation, the application of 28 U.S.C. § 1367(c). The Court will take the issue under submission on **February 7, 2007**.

DONE and ORDERED this 12th day of January, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE
